IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PREMIUM OF AMERICA, LLC, | * | |
| Plaintiff | * | |
| v. | * | CASE NO. 1:06MS00290 |
| William C. Sanchez, M.D. | * | |
| and | * | |
| William C. Sanchez, M.D., P.C., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## SECOND AMENDED COMPLAINT

Premium of America, LLC ("POA"), by its undersigned counsel, hereby sues William C. Sanchez, M.D., and William C. Sanchez, M.D., P.C. (collectively "Defendants"), and states in support thereof:

## THE PARTIES

1.  Plaintiff POA is a limited liability company organized under the laws of the State of Delaware. POA was established pursuant to the Amended Plan of Reorganization of Premium Escrow Services, Inc. ("PES" or the "Debtor"), confirmed on August 11, 2003 and entered on August 12, 2003 (the "PES Plan").[1]

---

[1] Under the PES Plan, POA was originally named Premium of Maryland, LLC. Premium of Maryland, LLC's name was changed to POA on August 19, 2003. The term "POA," as used in this Complaint, shall mean, collectively, Premium of Maryland, LLC, and POA.

# 260166 v5 PSC
012053-0002

EXHIBIT
2

2. Defendant William Sanchez, M.D. ("Dr. Sanchez") is a citizen of the District of Columbia and a physician who provides medical services in Washington, D.C. and Maryland. Upon information and belief, Dr. Sanchez is a resident of Washington D.C. and is licensed to practice medicine in Washington, D.C. and is an employee, agent, and officer of William Sanchez, M.D., P.C.

3. Defendant William Sanchez, M.D., P.C. is a Washington, D.C. professional corporation, which is in the business of providing medical care and, upon information and belief, has its principal place of business in Washington, D.C.

## JURISDICTION AND VENUE

4. The District Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. None of POA's members is a citizen of the District of Columbia, is incorporated in the District of Columbia, or has its principal place of business in the District of Columbia. POA has four thousand three hundred fifty one (4,351) members. Three thousand nine hundred nine (3909) of POA's members are natural persons, two (2) are corporations, four hundred seven (407) are trusts, thirty-one (31) are estates, and two (2) are limited liability companies.

5. All natural persons who are members of POA were citizens of states other than the District of Columbia as of November 19, 2004. Exhibit A, which is attached hereto and incorporated herein, lists the state of citizenship for each natural person who is a member of POA.

6. Finova Capital Corporation, a corporation that is a member of POA, was incorporated under the laws of the state of Delaware and had its principal place of

business in the state of Arizona as of November 19, 2004. Columbia International University, Inc., the other corporation that is a member of POA, was incorporated under the laws of the state of South Carolina and had its principal place of business in South Carolina as of November 19, 2004.

7. All trustees of the trusts that are members of POA were citizens of states other the District of Columbia as of November 19, 2004. Exhibit B, which is attached hereto and incorporated herein, lists the state of citizenship for each trustee of the trusts that are members of POA.

8. All estates that are members of POA were citizens of states other than the District of Columbia as of November 19, 2004. Each decedent was a citizen of a state other than the District of Columbia at the time of the decedent's death. Exhibit C, which is attached hereto and incorporated herein, lists the state of citizenship for each decedent at the time of death of such decedent whose estate is a member of POA.

9. Both limited liability companies that are members of POA were citizens of states other than the District of Columbia as of November 19, 2004. Exhibit D, which is attached hereto and incorporated herein, lists the state of citizenship for each member of the limited liability companies that are members of POA.

10. Defendants were citizens of the District of Columbia as of November 19, 2004.

11. The matter in controversy in this action exceeds the sum of seventy five thousand dollars ($75,000), exclusive of interest and costs.

12. Venue is proper pursuant to 28 U.S.C. § 1391(a).

## STATEMENT OF FACTS

### A. Beneficial, Premium Escrow Services, and Premium of America

13. In 1995, Imtek Office Solutions, Inc. ("Imtek") was formed as a holding company to acquire companies in the office equipment, office supply, digital imaging, digital outsourcing, and business space market. In 1997, Imtek created Imtek Services Corporation, which was involved in equipment financing and leasing, and Imtek Corporation, which was in the office technology and digital imaging business.

14. In October 1997, Imtek Funding Corporation, another Imtek subsidiary, acquired the assets of Thompson Business Products, a viatical settlement company doing business as Beneficial Assistance. Imtek Funding Corporation changed its name to Beneficial Assurance, Ltd. in May of 2000. In this Complaint, Thompson Business Products, Imtek Funding Corporation, and Beneficial Assurance, Ltd., as well as affiliates of Beneficial Assurance, Ltd., including without limitation Beneficial Financial Services, Inc., Beneficial Funding Corp., Beneficial Services Corp., BA Titling Trust 1, Atlantic Marketing, and Beneficial Assurance, Inc., will sometimes hereinafter collectively be referred to as "Beneficial."

15. As a viatical settlement company, Beneficial was engaged in the business of promoting the sales of interests in life insurance policies owned by terminally ill patients and other insureds, known as "viators." Beneficial established a network of brokers and companies who directed viators to Beneficial. Beneficial solicited investors through its settling agents located throughout the United States, and these investors

placed money with Beneficial based upon promised returns to be derived from matured life insurance policies (i.e., upon the death of the viator).

16. Imtek and its office technology and business product subsidiaries ceased operations in April 2000, with the sale of substantially all of their assets by the primary secured creditor, Provident Bank of Cincinnati. Imtek subsequently changed its name to Beneficial Financial Services, Inc. Imtek's remaining subsidiaries, Imtek Capital Corp., Imtek Acquisition, Imtek Services Corp., and Barbera Business Systems, Inc., also ceased operations.

17. Throughout its history, Beneficial had a designated escrow agent/trustee (typically an attorney) who, <u>inter alia</u>, assisted in closing the viatical settlements, traced patient progress, monitored patient medical history, and paid premiums on the viaticated policies.

18. Prior to 2001, the escrow agent was designated on the books of the insurance carriers as the owner of each policy. This allowed the escrow agents to file death claims upon the death of a viator. Moreover, Beneficial's investors generally purchased only a fractional interest in a viaticated policy; it is common for Beneficial's records to reflect ownership of a policy by four to ten investors. Because the insurance companies generally did not allow ownership on a policy to be shared, it was helpful to have the escrow agent named as the policy owner. Thus, whenever Beneficial transitioned from one escrow agent to another before 2001, the new escrow agent was forced to change the owner designation as to each policy. This process was time consuming and expensive.

19. In 2001, Beneficial retained Donald Grau ("Grau") to serve as its escrow agent. To avoid the effort and expense associated with transferring the beneficial ownership of the viaticated policies upon a transition to a new escrow agent, Grau formed a new corporation -- PES -- to serve as owner of the policies and pay premiums on all policies. Accordingly, future escrow agent transitions could be accomplished by transferring the ownership of PES rather than by changing the owner of each policy on the insurance companies' books.

20. On November 20, 2002, Beneficial and one of its affiliates, Beneficial Services Corp., filed Voluntary Petitions for Relief under Chapter 7 of the Bankruptcy Code. The same day, Beneficial's other affiliates, Beneficial Funding Corp. and Beneficial Financial Services, Inc., filed Voluntary Petitions for Relief under Chapter 11 of the Bankruptcy Code. On May 20, 2003, the Chapter 7 cases were converted to cases under Chapter 11 of the Bankruptcy Code.

21. On December 9, 2002, PES filed for relief under Chapter 11 of the Bankruptcy Code. As of PES's petition date, PES was shown on the records of the insurance carriers as the owner of all of the policies, except approximately twenty (20) policies that were held in the name of a third party for regulatory reasons. By May of 2003, because most of the viators had lived well beyond their projected life expectancies (some by many years), the funds in PES's premium reserve account were depleted.

22. On June 26, 2003, this Court entered an Order directing the procedural consolidation and joint administration of the Beneficial Financial Services, Inc.,

Beneficial Funding Corp., Beneficial Services Corp., Beneficial Assurance, Ltd., and PES bankruptcy cases.

23. Plaintiff POA was established pursuant to the PES Plan to administer and liquidate the viaticated insurance policies.

24. There are approximately 4,500 investors who purchased interests in life insurance policies viaticated through Beneficial. Following confirmation of the PES Plan, these investors and PES contributed to POA all of their interests in the viaticated insurance policies, and POA became the owner of the policies.

25. Under the PES Plan, confirmed by the Bankruptcy Court pursuant to 11 U.S.C. § 1129, the Beneficial investors and PES assigned to POA any claims that they may have against any individual or entity who was retained by Beneficial and/or PES in connection with the viatical settlements. POA, therefore, was charged with the responsibility of pursuing claims on behalf of PES and the Beneficial investors for the benefit of PES's creditors who filed allowed claims in the PES bankruptcy case and later became members of POA.

26. As discussed more fully below in paragraphs 33-43 of the Complaint, Defendants were retained by Beneficial to evaluate the life expectancy of certain viators, and these life expectancy evaluations were an integral part of the viatical settlement process. Accordingly, any claim the investors and PES have against the Defendants has been assigned to POA.

27. In return for their contributions to POA, the investors received an ownership interest (i.e., a member interest) in POA that is proportionate to the ratio of the

dollar amount of the death benefits purchased by that investor to the total dollar amount of the death benefits purchased collectively by all of Beneficial's investors. In return for contributions made to POA from PES, POA agreed to administer and liquidate the viaticated policies and distribute the proceeds from the policies to the investors. POA also agreed to pay certain amounts due under the plan in consideration for the issuance of a 100% stock interest in PES.

### B.     Beneficial's Viatical Settlements

28.    Beneficial began operating as a viatical settlement company in early 1997 and continued to operate through the date it filed bankruptcy on November 20, 2002 (this period is hereafter sometimes referred to as the "Relevant Time Period"). A typical Beneficial viatical settlement involved the activities described below in paragraphs 23-32 of the Complaint.

29.    Beneficial solicited investor funds directly and through its selling agents. To accomplish this goal, Beneficial provided marketing materials to potential investors.

30.    Investors signed a Purchase Authorization Agreement and mailed the document to Beneficial's escrow agent along with the payment for the investment. When investors were recruited, funds submitted by the investors were placed in the escrow agent's account, which held the funds of all investors.

31.    The Purchase Authorization Agreements entered into by Beneficial and the investors purportedly governed the terms of the investment. Pursuant to the terms of the Purchase Authorization Agreements, Beneficial acted as the investors' agent for the purchase of interests in viaticated life insurance policies. Beneficial agreed to represent

the investors (defined as the "Principal" in the Purchase Authorization Agreements) for the purpose of identifying, qualifying, and purchasing life insurance policies and all related death benefits in accordance with the purchasing criteria and instructions set forth in the Purchase Authorization Agreements.

32. Beneficial used the services of brokers to identify and purchase life insurance policies from viators. This process involved "bidding" a price for a policy offered by a broker. When Beneficial was the prevailing bidder, it would enter into a sales agreement with the broker for the right to receive the death benefits on the policy.

33. Beneficial was able to bid more for a policy if a viator was found by the Defendants to have a short life expectancy. Indeed, there was not a ready market for a policy if a viator's life expectancy exceeded four years.

34. Usually, Beneficial obtained medical records on the subject viator as part of the bidding process, and sent the viator's medical records to physicians, including Dr. Sanchez, seeking to obtain an accurate projection of the life expectancy of the viator. The purpose of the review of the records was to document the terminal illness of the viator and an expected date of death.

35. Beneficial purchased policies by using the investor funds held in the escrow agent's pooled investor funds account. Beneficial determined which investor funds would be matched with particular policies. The escrow agent caused a closing to occur through which the investor funds were disbursed to the various participants in the process. Beneficial prepared a viatical settlement sheet to provide direction on the disbursement of funds.

36. At settlement, the escrow agent disbursed funds from the pooled investor funds account to: (i) the broker and/or viator (often the viator was paid by the broker with a portion of the broker disbursement); (ii) the escrow agent; (iii) a premium reserve account to fund future insurance premium payments due through the viator's remaining life (usually this amount was calculated based upon the viator's life expectancy – as determined by Dr. Sanchez or another physician – plus one year); and (iv) Beneficial.

37. After the closing, Beneficial prepared a closing summary package for the investors whose funds were used in the settlement. The package was mailed to investors and it usually included the following information: (i) the name and rating of the life insurance company; (ii) the death benefit (i.e., face value) of the policy; (iii) the amount invested; (iv) the expected return (i.e., maturity amount); (v) the first page of the life insurance policy (with the viator's name redacted); (vi) a cursory report from the physician who reviewed the medical records and provided a life expectancy evaluation for Beneficial; and (vii) a document evidencing that the ownership of the policy had been transferred to the escrow agent, or that the escrow agent had been named as the irrevocable beneficiary.

38. Thereafter, as noted above, the escrow agent monitored the insurance policies, paying insurance premiums when due. In the rare circumstances in which a viator has died, the escrow agent has filed a death claim, taken appropriate actions to recover the death benefits payable under the policy, and remitted the death benefits to the investors in accordance with their interests in the policy.

**C.    Defendants' Role in the Viatical Settlement Process**

39. Generally, as noted above, a market for viatical settlements exists only if a policy insures the life of a person who is expected to die, due to terminal illness or advanced age, within a relatively short period of time (i.e., four years or less). Investing in the death benefits of an insurance policy covering the life of a young healthy person simply is not an attractive investment opportunity. Thus, when marketing viatical settlements, Beneficial made representations about the estimated life expectancy of the subject viator.

40. The estimated life expectancy is an important factor in determining the value of the viatical settlement. Specifically, a shorter life expectancy results in a higher sales price for the policy. For example, an investor would be willing to pay substantially more for a life insurance policy with a face value of $1,000,000 if the death benefit were likely to be paid in one or two years than if the death benefit would likely not be paid for several years.

41. Beneficial distributed marketing materials to potential investors that provided details of how the viatical settlement process worked. In these materials, Beneficial described Dr. Sanchez as an "independent" physician and provided a copy of his curriculum vitae. The Beneficial materials explained that the information from viators "is gathered, collated and sent" to a physician for his "independent review." The materials further related that a life expectancy is "independently verified" and projected for the viator "[b]ased solely" on the physician evaluation. The materials included the resumes of two evaluating physicians, including Dr. Sanchez.

42. Dr. Sanchez is generally familiar with the viatical settlement process and he knew that Beneficial, PES, and Beneficial's investors would rely on the life expectancy evaluations he provided.

43. Beneficial and PES justifiably relied on Dr. Sanchez's opinions in determining whether and at what price to bid on a policy. Beneficial's investors, in deciding whether to invest in viatical policies, justifiably relied on the representations in Beneficial's marketing materials concerning the medical reviews and life expectancy evaluations provided by Defendants.

44. Pursuant to his agreement with Beneficial, Dr. Sanchez reviewed and evaluated the medical records of numerous viators, and provided life expectancy projections on the lives of these viators. Dr. Sanchez was paid a fee for each evaluation, and earned a significant sum performing these evaluations during the Relevant Time Period.

45. Defendants' evaluations, however, were neither accurate nor reliable. In the vast majority of cases, the life expectancy projections were grossly inaccurate. Indeed, most of the viators have lived far beyond their estimated life expectancies.

46. According to Plaintiff's most recent data, Defendants evaluated the life expectancies of 137 viators whose life insurance policies were viaticated by Beneficial. Of these viators, one hundred ten (110), or 80%, are still living. On average, the viators assessed by Defendants have outlived their life expectancies to date by 43 months – more than 3 1/2 years. The viators who are still alive have outlived Defendants' life expectancy projections to date by an average of 51 months - more than 4 years.

47. Defendants projected that 31 viators would live only 0-12 months. Remarkably, however, 26 of those viators (84%) are still alive and have lived beyond Defendants' projections by an average of 77 months – nearly 6 1/2 years.

48. Moreover, in many cases there is no evidence in the medical records to support Dr. Sanchez's short life expectancy projections, which typically ranged from 12 to 48 months.

49. Because of the gross inaccuracy of Dr. Sanchez's life expectancy evaluations, the costs of maintaining the policies has far exceeded what was expected, and the return to investors has been delayed and diminished.

## Count 1: Negligence

50. Plaintiff incorporates the allegations contained in paragraphs 1-49 above for the purposes of this Count.

51. As health care providers, Defendants owed Beneficial, PES, and Beneficial's investors a reasonable duty to exercise that degree of care and diligence as used by a reasonably competent physician providing life expectancy projections.

52. Defendants breached the duty they owed to Beneficial, PES, and Beneficial's investors by providing grossly inaccurate life expectancy projections on most viators.

53. Defendants' breach of their duty of care proximately caused Beneficial, PES, and Beneficial's investors to suffer monetary damages.

54. Beneficial's investors and PES have assigned their rights to pursue claims against Defendants to Plaintiff.

WHEREFORE, the Receiver requests judgment in the amount to be determined at trial in excess of $1,000,000, plus prejudgment interest, costs, and expenses and any other relief deemed appropriate and proper by the Court.

### Count 2:  Negligent Misrepresentation

55.    Plaintiff incorporates the allegations contained in paragraphs 1-54 above for purposes of this Count.

56.    Defendants, in the course of their business, profession, or employment, supplied life-expectancy projections for the guidance of Beneficial in its business transactions.

57.    Defendants failed to exercise reasonable care and competence in evaluating the life expectancies of viators.

58.    Because of their failure to exercise reasonable care and competence, Defendants provided inaccurate life-expectancy projections to Beneficial.

59.    Defendants knew that Beneficial intended to supply life-expectancy projections to its investors for the investors' benefit and guidance.

60.    Defendants knew that Beneficial intended the life-expectancy projections to influence potential investors in deciding whether to purchase viatical investments through Beneficial.

61.    Beneficial and PES justifiably relied on Defendants' opinions in determining whether and at what price to bid on a policy.  Beneficial's investors justifiably relied upon the inaccurate life-expectancy projections in purchasing viatical investments through Beneficial.

62. Beneficial, PES, and Beneficial's investors suffered pecuniary losses caused by their reliance on Defendants' negligently rendered and grossly inaccurate life-expectancy projections.

63. As a direct result of the negligent misrepresentation of facts and concealment of facts, Beneficial, PES, and Beneficial's investors suffered monetary damages.

64. Beneficial's investors and PES have assigned their rights to pursue claims against Defendants to Plaintiff.

WHEREFORE, POA requests judgment in an amount to be determined at trial in excess of $1,000,000, plus prejudgment interest, costs, and expenses and any other relief deemed appropriate and proper by the Court.

### Count 3: Gross Negligence

65. Plaintiff incorporates the allegations contained in paragraphs 1-64 above for purposes of this Count.

66. As health care providers, Defendants owed Beneficial, PES, and Beneficial's investors a reasonable duty to exercise that degree of care and diligence as used by a reasonably competent physician providing life expectancy projections.

67. Defendants breached the duty they owed to Beneficial and its investors by providing grossly inaccurate life expectancy projections on most viators.

68. Defendants' breach was an extreme deviation from the ordinary standard of care and constitutes wanton, willful, and reckless disregard and conscious indifference for the rights of others.

69. The risk associated with deviating from the standard of care in projecting life expectancies is so obvious that Defendants must have been aware of it and so great that it is highly probable that harm would follow.

70. Defendants' breach of their duty of care proximately caused PES and Beneficial's investors to suffer monetary damages proximately caused by Defendants' breach of their duty of care.

71. Beneficial's investors and PES have assigned any right they have to pursue claims against Defendants to Plaintiff.

WHEREFORE, the Receiver requests judgment in the amount to be determined at trial in excess of $1,000,000, plus prejudgment interest, costs, and expenses and any other relief deemed appropriate and proper by the Court.

Dated: June 27, 2006                                Respectfully Submitted,

                                                                         /s/ David G. Sommer
Paul S. Caiola, Federal Bar #23940
David G. Sommer, Federal Bar #27581
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, Maryland 21201
(410) 727-7702

Attorneys for Plaintiff Premium of America, LLC